On call 218-0619, people of the state of Illinois v. Justin and Hubly, on behalf of the people, excuse me, on behalf of Mr. Hubly, Mr. Ian M. Barney, on behalf of the people, Ms. Diane Campbell. Good morning, counsel. Justice Jorgensen regrets that she is unable to be here this morning, but, of course, we'll listen to the arguments as they're being recorded today, and she'll have access to them. All right, Mr. Barney. Good morning again, Your Honors. May it please the Court. My name is Ian Barney, and I represent the appellate, Justin Hubly. Mr. Hubly has raised three primary issues in this appeal. However, today I'd like to spend my time talking about the first issue, whether or not the trial court incorrectly denied Mr. Hubly's motion to suppress evidence and dismiss charges, where a school administrator used information learned from Mr. Hubly during a compelled statement to uncover additional evidence against Mr. Hubly. There are three reasons this Court should reverse the trial court. First, use of Mr. Hubly's statement by Dr. Randy Davis, the school administrator, was an evidentiary use because he used it as an investigatory lead. Second, the trial court applied the incorrect legal framework in this case when it concluded that the use was a permissible, non-evidentiary use. And third, even assuming that the court applied the correct framework and correctly concluded that this was a non-evidentiary use of the statement, the trial court incorrectly concluded that it was tangential use rather than substantial use. But now, didn't the trial court also find that the evidence was derived from a source wholly independent of the compelled testimony? That was an explicit finding of the court as well, was it not? That is correct. That was an explicit finding. That finding is incorrect for a couple reasons. First off, it runs counter to the trial court's other finding that Dr. Randy Davis ran down additional evidence of investigation based on the information that he learned from Mr. Hubly. Second, I think generally speaking, the trial court was persuaded by the fact that these other witnesses who later testified at trial had independent personal knowledge of the events that they were testifying about. But that's a separate issue. That's an issue with respect to whether or not their particular testimony was tainted by Mr. Hubly's compelled statement. That's not the allegation here. Well, but if the trial court made the finding and based his decision, at least in part, that the evidence was at an independent basis, why do we need to get into the very unclear and confusing discussion that cases like Haley's, the First District case, invites us into? Why must we go there? Well, first off, I'm glad that I'm not the only one that thinks it's confusing and unclear. We need to get there because, for a couple reasons. One, the Court's finding that the use of Mr. Hubly's statement was non-evidentiary is not correct. And to answer that question, we need to dive into the difference between evidentiary use and non-evidentiary use. That's, I think, of primary importance in deciding this issue and the first question, whether or not the trial court incorrectly concluded that this was a non-evidentiary use of Mr. Hubly's statement. And this was, in fact, an evidentiary use, not a non-evidentiary use, because what Dr. Randy Davis did is he interviewed Mr. Hubly. And when he interviewed Mr. Hubly, he asked him, have there been any other students other than Michael Penza, other than Colton Browsky, who've come to your house this past summer? Mr. Hubly says, yes, there has, and he gives them names. Dr. Davis then goes and interviews Michael Penza, and not only does he ask him about, well, what happened, you know, what are your allegations involving you, what are your allegations involving Mr. Browsky? He asks him, have there been any other students that you know of that have been Mr. Hubly's? So he never would have asked that if it wasn't for Davis's statements that other people have been in those houses. Judge, I don't know if he would have or not, but I think that's the point. But Davis already knew that there was more than one incident. He wasn't just investigating the Penza incident. He knew from Penza, before he even talked to your client, that there was a Browsky incident. Correct. So he knew there was more than one time that something happened involving alcohol and former students at your client's house. That's correct, but he didn't have any information beyond those two individuals. And the issue of whether or not he would have asked Michael Penza about other instances, you know, it's the State's burden to prove that, and they didn't prove that. Well, the judge found that it was, whatever the language he used was a pretty strong language, and basically it's incomprehensible to think that the police and Davis would have asked Penza if this happened other times. Because Penza gave all the other names for the most part, correct? Correct. Well, he gave all the other names except for Katie Murphy, who was provided by Trevor Bryant, who was given to not satisfy Mr. Penza. I mean, your client, according to his testimony, the only other name he gave, other than Penza and Dombrowski, the only other name he gave was Polk. In his testimony, I think it was also Rebecca Polk, Alyssa Teeters. Well, no, I'm talking about just the people. Just the charges. Correct, correct. Rebecca Polk was the only other one who was involved in this. And Penza also mentioned Polk. Correct. Correct. Yes. I still don't think that answers the question, Your Honor, in respect to it. And the reason is because it is the State's burden to come forth with evidence that not that, you know, he might have asked that question or Penza might have volunteered that information, but to prove that their evidence derives from a source that is legitimate and wholly independent. There's no evidence of that. They didn't call Michael Penza to say, oh, yeah, of course I'm going to talk about these other instances. They didn't call Amy Rispecki, who talked to Michael Penza initially. Essentially what the trial court did is the trial court speculated and said, well, you know, I think it was inevitable that he was going to get this information. And I think it's the D.C. Circuit in the United States v. Slot that said, and I may be thinking of the wrong case, but they said, look, we can't just draw favorable inferences in favor of the government to say they met their burden. They've got to come forward with evidence to prove it. And there's no evidence here that before Mr. Hooghly's statement, they, excuse me, there's no evidence that even without Hooghly's statement that they would have asked Michael Penza about students other than Dombrowski and other than Michael Penza. And, in fact, if you look at the way Dr. Davis approached Michael Penza, it's almost as if he was trying to get around the fact that he learned this information from Mr. Hooghly, because he doesn't go to Mr. Penza and say, hey, I've got this information about these other students. He says, oh, well, have there been any other students? Well, he knows there have been, because Mr. Hooghly told him. So what he did was ---- Well, certainly he'd want to know, I mean, the way he asked the question, you think that's significant? I mean, certainly why would he put words in someone's mouth? He'd want to not suggest the answer if he went to him and said, oh, I know I've got, you know, this other information from somebody else. So I'm not sure how significant that is, the way he asked the question or interviewed him. I don't think it's the most significant point, but I think it's ---- to me it's interesting, and it suggests that he's trying to do an end run around the protections that are afforded to Mr. Hooghly, the use and derivative use, the immunity that Mr. Hooghly is entitled to, by essentially learning this information and then going and following up on it in a somewhat oblique way by not directly saying, hey, you know, I heard that other students have been there. Do you know anything about that? He says, oh, by the way, are there any other students that have been there? He knows they're out there. He knows they're out there. And I think, you know, that's what makes this ---- first, I want to back up a little bit. The trial court's analysis is just generally incorrect because it made the wrong finding right off the bat by finding that the use was not evidentiary. That leads to a whole different framework. And then the trial court found it was a tangential use rather than a substantial use. But this was not a non-evidentiary use. This wasn't evidentiary use. It was using the statement as an investigatory lead. So what ---- so do we need to remand this case? Your Honor, I ---- I mean, what are you suggesting, for a new Castigar hearing? No, Your Honor. Since the ---- well, you said the trial court used the incorrect analysis. Correct. Even though he did make the finding that Castigar says one needs to make, but you're discounting that for the moment, that there was an independent source. So why don't we need to remand then? I think the record in the trial court is full. I'm sorry, is what? The record is full and complete. I think there's enough information here for this Court to look at, look at the record, and say, yes, this was an evidentiary use, not a non-evidentiary use, and the State failed to meet its burden of proving that this is ---- that this information was derived from a legitimate source, wholly independent from Mr. Hoover's statement. I think the record supports that conclusion. I don't think there's any more evidence that needs to be reduced at a hearing. So I would respectfully ---- I don't think this case needs to be remanded. I think that this Court can make all of those legal findings based on the record and factual findings based on the record in front of it. And that's the issue. If we were to agree with you that this was entirely evidentiary, it has nothing to do with non-evidentiary use, the only real issue then is, was the trial court correct in determining that it came from a wholly independent source? Correct. Correct. Now, you cite Pagnotti, and similar to this investigatory lead argument that you made, was Pagnotti an evidentiary use case or a non-evidentiary use case? Evidentiary use, Your Honor. And what happened in Pagnotti is the ---- this is a Federal case. The government, an FBI agent, learned through the immunized testimony about a transaction, learned actually the fact that a transaction had occurred, and that's information that the government didn't have. They suspected one had occurred because they had a promissory note, but they didn't have evidence of the actual transaction. The defendant in that case, the person who ends up being the defendant in that case, ultimately confirms in immunized testimony, yes, there was this transfer of a CD worth like $150,000. What the government does based on that testimony is goes and subdues financial records, and there is, in fact, independent proof that this transaction occurred. But what led them to that proof is the defendant's statement that the transaction actually occurred, which is information they did not have. I think that's analogous here. What Dr. Davis does is he takes this information that he gets from Mr. Hoogley about other students, and he goes and he confirms it with Michael Penza. And not only does he confirm it, but he gets all the names of the people who had previously been there, and as the court knows, those people end up being all the witnesses against Mr. Hoogley at trial for five out of the seven counts. So I think this is... Well, there was no evidence. In Pagnotti, there was no evidence of misconduct or illegal transfer prior to the Garrity statement. Because in this case, Penza came forward before the Garrity statement and told a teacher at the school that this had happened to him and it happened on another date to another person. So you actually have evidence of alleged misconduct, not on one occasion, but on two different occasions involving two different former students. That's a little different than Pagnotti, isn't it? It is. It's certainly a little different. In fact, I still think Pagnotti confessed, and here's why. In Pagnotti, the government had that same suspicion of wrongdoing because they were investigating a third person who was involved with the defendant, Pagnotti, in money laundering. They had the suspicion already. In fact, they had a promissory note, and they... But he wasn't under investigation. There was no... That's the part that's different. I'm sorry, Your Honor. Pagnotti was not under investigation. I think he... I would say he was under investigation. He was immunized, which to me says that they were looking at him for potential criminal activity. And the FBI agent in that case testified that she thought that the fact that this promissory note existed, but there was no evidence that a loan had been repaid, was suspicious. So he was under investigation, and they were looking at him already. And, you know, maybe in some alternate universe they subpoenaed those financial records anyway. Just like here, you know, if Mr. Hooley never gives a statement, maybe Dr. Davis asked the same questions of Michael Prentzl. Maybe not that. And I think that was the point in Pagnotti is that you cannot act on information you learn through an immunized statement that violates the use and derivative use of immunity afforded to witnesses. And the reason for that is because the government, or in this case the state, and the witness have to remain in the same position as if the person never gave a statement, as if they invoked their Fifth Amendment right against self-incrimination. And to me this is the biggest point. When we're talking about evidentiary versus non-evidentiary use, if we employ this non-evidentiary use framework, the protections of the Fifth Amendment become so uncertain because we don't even have a definition for non-evidentiary. Every case that looks at it says, well, we don't really know what it is, but it would be kind of, I don't know if it's a note when you see it type of thing, but there's no definition. The D.C. Circuit calls the definition of non-evidentiary elusive. And then even if you get to non-evidentiary, then you've got to decide if the use is substantial or tangential. There's no definition for that either. You don't know when does a use become substantial versus tangential. There's no measurement for that. So now you have a defendant, if you take a few steps back, who's being compelled to give a statement under threat of discharge, and he's giving the statement not knowing how it's going to be used in the future because there could be uses according to some of these circuit courts and according to alias. There are impermissible uses of the defendant's statement. But what are they? We don't know because there's no definition for non-evidentiary. There's no definition. Your Honor, I see my time has ended. If I could just continue my thought. Finish your sentence? Sure. Thank you. There's no definition for substantial. There's no definition for tangential. And this is not even a secret. The courts admit it. Like Your Honor said, this is very unclear. And I think that puts a potential defendant in a very unfair position when deciding whether or not to actually speak under a granted immunity. Thank you, Your Honor. You'll have time on rebuttal. Thank you. Thank you. Ms. Campbell? Good morning, Your Honors. On page 13 of my brief, I note two points of law. The first is from Slobe. The police would have taken the same steps entirely apart from the motivating effect of the immunized testimony. That's part of the independent legitimate source test. And then from Hallius, the exact same testimony would have been elicited from the witnesses in the course of an investigation or trial without any exposure to the defendant's statement for peer pursuit to guarantee warnings. And then Your Honors noted the trial court findings, which are at C-68. And the court notes that it was known from the beginning about Penza and Dombrowski. And then the judge points out that there were multiple meetings at the defendant's house. They involved alcohol. They involved former students. And they involved touching. And that's at page 15 of my brief. And so this is a natural inference, and the trial judge drew this, that given those circumstances, yes, Dr. Davis, you know, is going to be concerned with, because he has an active teacher, it's during the school year, he's going to be concerned whether there are more students involved and whether there are current students involved. The police are going to be concerned, and in their investigation, pursue that line of investigation. Are there more students involved? So the information that is actually used against the defendant, in the meeting with Dr. Davis, Steve Olson, the principal, and the union rep and the defendant, they consulted Dr. Davis's notes from that, and that's, I believe, I'm having a little trouble reading my reference, but it's a supplemental record at 2C10, and he notes the names were Dombrowski, Penza, and then Tanner Markin. And there are no issues or charges involving Tanner Markin. That's the only third student that the defendant mentioned. Does it matter that Ms. Polk's name came up first, according to the defendant's testimony, from the defendant as opposed to from Penza? Aside from the trial court's credibility finding against that, it doesn't matter in this context, because the judge, Polk's name also came out from Penza. And the police and Dr. Davis are always certainly going to interview Michael Penza, because he is one of the main complainants. He's the one that started the whole issue, because he's the one that phones the other teacher and mentioned the incidents involving touching alcohol with him and a separate touching of alcohol with Dombrowski. So the police, Dr. Davis, are going to talk to Penza, regardless of whether or when they talk to the defendant. So does that constitute the basis for the court's finding there was an independent source? Exactly. And in Penza's discussion, he mentions... Penza mentions Dombrowski, Jennifer Anderson, Giovanni Diddy, Rebecca Polk, and Trevor Bryan. And then Dr. Anderson interviews Trevor Bryan, and from there they get Keegan Murphy's name. The argument is that they wouldn't have asked about those other people other than Penza and Dombrowski if the defendant hadn't mentioned other names and other incidents, per peg matter. Well, per the two cases that I just mentioned, which are Slow and Halleas, the police would... Dr. Davis and the police, subsequently for trial, would have taken the same steps entirely apart, which is they would have interviewed Penza. Well, in the context of the situation, which is a school situation, it is, and I think you pointed out the trial judge's rather strong comment that it's virtually unimaginable that they wouldn't ask about other incidents. So in the facts and circumstances of this case, certainly they are going to be asking these students about other students and other incidents. They already know that there's more than one incident at the defendant's house. They know about alcohol. They know about inappropriate touching. So those areas of investigation are already set forth before there's ever any statement by the defendant in the year of the situation. Well, but Penza did not testify at this evidentiary hearing, right? So how could the trial court really have known whether Penza would have provided this same information to Dr. Davis had Davis interviewed him before he interviewed the defendant? I think it's a logical, natural inference from Dr. Davis' statement that when he did in fact talk to Penza, Penza told him about other incidents. And I think it is unreasonable to think that people aren't going to ask Penza and when he talks to Dr. Davis or the police that he is not going to relay other incidents that he knows about. And again, the trial judge was at the hearing. He heard Dr. Davis' testimony. He heard the defendant's testimony. Is there any indication that Dr. Davis actually prompted Penza to give the information that he ultimately gave? No. From my recollection of his testimony, there's absolutely nothing that he's trying to – he has a natural concern for his former students and any possible present students. So I think he's not trying to encourage him to make anything up or to instigate some sort of fictitious charges. And certainly, you know, then you have the police and when Dr. Davis talks to Trevor Bryan. And again, there's no indication that he is trying to solicit or create other situations that aren't there. Did the trial court use the correct legal standard here? Yes. And what was that legal standard the trial court used? Okay. At the Castigar hearing, the state has to show by a preponderance of the evidence. So more likely than not. And that trial court's decision is only reversed if it's clearly erroneous. So this court examines it and it's clearly erroneous. And I think given – the trial judge makes a thoughtful consideration of this. And he obviously, you know, has taken careful assessment of the testimony. I believe there were three witnesses. It's Dr. Davis, the – I think it's the community resource officer who then turned the notes over, or Detective Idol. I'm sorry, I can't remember which it was. And the defendant. So the trial judge heard the three witnesses at that point. The trial judge didn't seem to pick a lane, though. I mean, the trial judge, you know, was going off about evidentiary uses and then made a finding about independent evidence and then made a non-evidentiary and basically said if the trial judge followed the federal cases, everything would be suppressed. I don't think he did that because he is clearly – in the motion to reconsider, he points out the Hellingist case. And that is, you know, strongly for the independent source. In fact, independent source comes from Kastigar. So if you were going to eliminate everything, you know, non-evidentiary, then why would you have an independent source doctrine in the first place? And to kind of illustrate the difference, let me quote from the McDaniel case. And in that case, the U.S. attorney read the compelled statement, and the McDaniel court found that the attorney could not wholly obliterate that from his mind in his preparation for trial. So that is incredibly broad. And part of the Kastigar – But that's a non-evidentiary use, is it not? Right. Right. Okay. So what you're saying is that the federal courts have gone completely off the rails after Kastigar. Just with McDaniel. The majority of the federal courts are following a narrower one. Valesko points out – that's on page 18 of my brief – the burden on the prosecution to establish an independent source for evidence against a defendant is a heavy one. We decline to make it an impossible one to bear. We adopt the position in Mariani and cases following that the near-tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not a new commercial use. And again, the courts are emphasizing a balancing test, and that both the prosecution and the defendant should not be put in a better or worse situation than if the defendant had not made his compelled statement. One of the non-evidentiary uses they talk about, though, is not the influence just on the prosecutor, but also influences on other witnesses who may have been exposed to the statement. That's the North case. In North, many of the witnesses were reading the compelled testimony, and then they were discovering that those witnesses were altering their own testament based on what they had learned in that compelled testimony. And that would be an improper use. And, you know, that's obviously the compelled statement and the defendant's statements are influence, and that would be improper. That did not occur here. There's no indication that, you know, Penza or Dombrowski. Right. I don't think Nelson's arguing that. In fact, he's arguing it's an entirely evidentiary use. Do you agree with that? I disagree with that strongly. As I said, they did not use his compelled statement to go anywhere. They weren't going to naturally go anywhere. What I'm getting at is the allegation is of evidentiary use only. Do you agree with counsel that the allegation here of misconduct is simply evidentiary use and not a non-evidentiary use? Right. And that we go with a wholly independent test to see whether it's absolute? From what I have deduced from his brief, I believe that this is an argument. Do you agree with that? I mean, because the trial court, again, we lost on some tangents here. His testimony was a little bit muddled because he goes into non-evidentiary. But he has the basics right in that they weren't going anywhere that they weren't naturally going to go. And that is, in fact, an evidentiary use. If you are using the defendant's statement to find out about things that they had no knowledge of, that they couldn't have found out independently. And in this case, they can't find out independently because they're going to interview Penza. They're going to interview Dombrowski. Penza gives them Tanner Bryan, who provides the only other person mentioned, Katie Murphy, which was not mentioned by Penza. So, again, it's all independently verifiable or an independent source for investigation of the exact same type of incidents. We already know there's multiple, so they're going to be looking for other potential victims. And it involves the same type of conduct, which is alcohol and touching. I think we have more questions. Just one real quick question. I'm trying to remember, but I think in your brief you commented briefly on the prayer for relief in the opening brief had to do with excluding Anderson. Anderson, the court, that's the one count where the defendant was found not guilty. She was found not guilty. Right. So. Right. Right. Yeah. All right. Thank you. Mr. Garnett. Counsel, just to follow up on my last question. The prayer for relief is different than what you were asking for at page 10 of your reply brief. So I just want to make sure I'm understanding what you're actually asking for. Because you asked that the dismissal be granted in 2187, and 2187 counts 3 through 5, whereas I think in the white brief you asked it just counts 3 and 4. Judge, I think 3 and 4 is probably correct because 5 wasn't. I just want to make sure I understand. And I apologize. That was a mistake on my part if I put that in somewhere else in the brief. I just wanted to address a couple points really quickly. First off, as to Slough, S-L-O-U-G-H, I'm not sure if it's Slough or Slough, but Slough and Haleas, those cases are completely distinguishable because the issues in those cases is whether or not witnesses' testimony was tainted by their having seen or read or heard the immunized statements. They didn't involve the use of a statement as an investigatory lead. I think in Slough, it was basically a Blackwater case where there was news coverage about immunized testimony that implicated other individuals. Witnesses had seen that testimony or seen the reports of that testimony on TV, and the question was, well, are those witnesses now tainted? That's not what's at issue here. Haleas is a prosecutor who reads immunized testimony of a police officer. But when they talk about an independent basis in those cases, they're talking about witnesses who were occurrence witnesses and whose testimony was not tainted by having seen or heard the immunized statements. That's not what we have here. There's no allegation that Trevor Graham, Rebecca Pope, or Katie Murphy saw or read Mr. Googly's statement. The allegation is they wouldn't have been discovered but for Dr. Davis' use of Mr. Googly's statement as an investigatory lead. And I think Ms. Campbell said that it was reasonable and logical to assume that Dr. Davis would have or, excuse me, that Michael Benson would have offered this same information regardless of Mr. Googly's statement. But if you actually look back at what he told Ms. Rispecki, who was the initial person who heard the complaint, he didn't mention anything other than the information concerning himself and Ms. Dombrowski. So I don't think it's a foregone conclusion that he would have voluntarily offered information about other students other than himself and Ms. Dombrowski because, in fact, he hadn't done that when he talked to Ms. Rispecki in the first place. But there's no information that Dr. Davis led him to disclose that information or prompted him to disclose it, is there? I would say there is. He specifically asked Mr. Penza after Mr. Penza had given information about his own allegations and the allegations involving Ms. Dombrowski. Dr. Davis then specifically asked him about other students who had been in Mr. Googly's house. Well, he didn't ask him specifically, was so-and-so, was so-and-so in the house? I think it wasn't the question, a very general question. Were there any other students who were in the house that summer? Correct. Right. To me, I view that as prompting, and I think that prompts the additional information which may not have otherwise been revealed. The fact that he had to ask the question, I think, is maybe telling on that point. When we're talking, I just want to touch on one other point. This is not the non-evidentiary use. When you look at the case law, non-evidentiary use has to do with prosecutorial decision-making and prosecutors reading or hearing the witness testimony and then going and trying the case. I think counsel agreed with you. Yeah. This is not that. And so she agrees with me, but she also maintains that this is non-evidentiary use. It's not. It has nothing to do with prosecutor preparing for trial or deciding to indict or deciding to plea bargain or formulating trial strategy, which are the things that courts talk about when they talk about non-evidentiary use. This case has to do with a school administrator taking Mr. Googly's statement and using it as an investigative lead. I think that is a clear evidentiary use, and the State failed to prove that these witnesses, that the discovery of these witnesses would have occurred but for the use of that statement. There's no legitimate source wholly independent other than Mr. Googly's statement for these witnesses, and for that reason we ask that the Court reverse the trial court's ruling. Thank you. Thank you, Your Honor. Thank you very much. Thank you, counsel, for your arguments this morning. The Court will take them under advisement and we will render a decision in due course.